UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ANGELA BLOUNT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 3:15-cv-00876 |
| ) | Judge Aleta A. Trauger |
| UNITED OF OMAHA LIFE ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

United of Omaha Life Insurance Company ("United of Omaha") has filed a Motion for Judgment on the Administrative Record (Docket No. 16), to which Angela Blount has filed a Response (Docket No. 20). Blount has also filed a Motion for Judgment on the Administrative Record (Docket No. 18), to which United of Omaha has filed a Response (Docket No. 21). For reasons discussed herein, United of Omaha's motion will be granted and Blount's motion will be denied.

## BACKGROUND

This action – brought under the civil enforcement provisions of the Employee Retirement Income Security Act, 29 U.S.C. § 1132 *et seq.* ("ERISA") – concerns long term disability ("LTD") benefits. Blount is a resident of Rutherford County, Tennessee, and a beneficiary under a group LTD policy made available through her former employer and underwritten and administered by United of Omaha. (Docket No. 1 ¶¶ 4–5.) Blount, a former hospital controller, was awarded and began receiving LTD benefits after leaving work in March of 2008. (Docket No. 13, p. 2015.) Those benefits were terminated effective May 23, 2015. (*Id.* at pp. 124–28.) Blount has exhausted the required appeals under the plan and now challenges the termination of

1

her benefits in this court.

**I. Applicable Plan Provisions**

Blount's plan employs a different definition of disability for the first two years of a recipient's benefits than it does for any years thereafter. For the first two years, disability is defined as follows:

> Disability and Disabled means that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:
> - prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
> - unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.

(Docket No. 13, p. 20.) After the monthly benefit has been paid for two years, however, the definition of disability is revised to refer only to situations in which the recipient is "unable to perform all of the Material Duties of any Gainful Occupation." (*Id.*)

If a recipient becomes permanently disabled due to injury or sickness prior to the age of 63, she may receive LTD benefits for a maximum benefit period lasting at least until her "Social Security Normal Retirement Age," as defined by the plan. (*Id.* at p. 28) If the recipient's disability is due to a mental disorder or alcohol, drug, or substance abuse, however, her eligibility period may be shorter under the plan's relevant benefits limitations. (*Id.*) Under the plan's substance abuse limitation,

> If You are Disabled because of Alcohol or Drug Abuse and/or Substance Abuse, Your benefits will be limited to a total of 24 months while insured under the Policy, unless You are confined as a resident inpatient in a Hospital at the end of that 24-month period. The Monthly Benefit will continue to be paid during such confinement.

(*Id.* at p. 29.) The plan adopts the following definition of Alcohol or Drug Abuse and/or Substance Abuse:

2

> Mental Disorder/Alcohol and Drug Abuse and/or Substance Abuse means any condition or disease, regardless of its cause, listed in the most recent edition of the International Classification of Diseases as a mental disorder.
>
> The Policy may include limited benefits for any one or more of the conditions or diseases included in this definition. If it does, only those limited benefits relating to those conditions or diseases will be available.

(*Id.* at p. 54.)

The plan grants United of Omaha discretion in interpreting and construing the policy, as well as in making benefits determinations:

> By purchasing the Policy, the Policyholder grants Us the discretion and the final authority to construe and interpret the Policy. This means that We have the authority to decide all questions of eligibility and all questions regarding the amount and payment of any Policy benefits within the terms of the Policy as interpreted by Us. Benefits under the Policy will be paid only if We decide, in Our discretion, that a person is entitled to them. In making any decision, We may rely on the accuracy and completeness of any information furnished by the Policyholder or an Insured Person. Our interpretation of the Policy as to the amount of benefits and eligibility shall be binding and conclusive on all persons.

(*Id.* at p. 50.)

## II. Blount's Medical and LTD History

In June of 2007, Blount – then thirty-five years old and living in San Antonio, Texas – was referred by her physician to rheumatologist Dr. Pendleton Wickersham in the wake of a positive antinuclear antibodies ("ANA") test. (Docket No. 13, p. 2648.) Blount complained to Wickersham that she was experiencing pain in her lower back, elbows, hands, wrists, and head, as well as problems concentrating and insomnia. (*Id.* at p. 2646.) Wickersham initially noted that Blount's reported symptoms were consistent with undifferentiated connective tissue disease. (*Id.* at p. 2648.) Blount also suffered from depression and anxiety, which Wickersham treated with alprazolam, also known by the trade name "Xanax." (*Id.* at pp. 2622, 2631.) In March of 2008, Wickersham referred Blount to a neurologist, Dr. Suzanne Gazda. (*Id.* at p. 1830.) Gazda

suggested that anxiety and stress might be a "strong driving factor" for some of Blount's symptoms and was otherwise unable to offer a neurological explanation for Blount's condition. (*Id.* at pp. 1826, 1832.) Wickersham continued to treat Blount, and, on May 5, 2008, he revised his diagnosis from undifferentiated connective tissue disease to systemic lupus erythematosus. (*Id.* at p. 2625.) By July 18, 2008, Wickersham's records showed that Blount was experiencing a decline in her functional status, particularly with regard to her fatigue and an inability to concentrate. (*Id.* at p. 2620.)

In September of 2008, Blount applied for LTD benefits. (*Id.* at p. 2742.) Wickersham supported the application, opining that Blount could, at most, perform one or two hours of sedentary work per day. (*Id.* at pp. 2752–53.) United of Omaha approved the application but referred Blount for an independent medical evaluation ("IME") by another San Antonio physician, Dr. Kenneth DesRosier. (*Id.* at p. 2404.) DesRosier opined that Blount did not "appear to have Systemic Lupus Erythematosus" and that he did not believe that her symptoms had any relationship to her earlier positive ANA test. (*Id.* at pp. 2410–11.) DesRosier suggested that it would be reasonable to consider the possibility that Blount suffered from fibromyalgia instead, except that her exam did not reveal any tender points, as would be expected for that diagnosis. (*Id.* at p. 2411.) He also noted the possibility that her concentration and fatigue issues could be related to the medications she was taking. (*Id.*) By this point, Blount was taking Norco – a combination of hydrocodone and acetaminophen – and a number of other medications in addition to the alprazolam. (*Id.* at p. 2407.) Although DesRosier saw no evidence of lupus and considered fibromyalgia unlikely, he agreed that Blount was disabled, advising that, until Blount received adequate pain management treatment, she would likely be unable to work at all. (*Id.* at p. 2412.)

4

Blount continued to receive benefits and, at some point, moved to Tennessee, where she began receiving treatment from neurologist Dr. Robert Cochran and rheumatologist Dr. James Gore. (*Id.* at pp. 1655–56.) A September 16, 2009, letter from Cochran to Gore describes Blount as "extremely depressed," details her history of pain and issues with cognition and memory, and notes that she is on both Norco and the opioid oxymorphone, commonly known by the trade name "Opana." (*Id.*) Blount was also still taking alprazolam, and Cochran added another drug—armodafinil, or "Nuvigil"—that promotes wakefulness and that Blount reported to synergistically enhance the effects of her oxymorphone. (*Id.* at pp. 1653–54.)

In August of 2011, Blount began seeing Dr. Michael Laccheo in Murfreesboro, Tennessee, and Laccheo immediately questioned several aspects of her past treatment. Laccheo concluded that Blount's stated symptoms were not consistent with active lupus and wrote, "I am also unclear why she is on such massive doses of narcotics given her prominent sleep apnea and cognitive symptoms consistent with narcotic toxicity." *(Id.* at p. 1266.) At her next visit, Laccheo and Blount discussed whether Blount would be happy with Laccheo's philosophy of treatment, including the fact that he disfavored the use of narcotic medications for treating inflammatory/autoimmune disease or chronic pain syndromes. (*Id.* at p. 1263.) Blount stopped seeing Laccheo and continued to see Wickersham in San Antonio, despite the substantial travel required. (*Id.* at pp. 1220–31.)

In 2011, United of Omaha referred Blount for a second IME, this time with Dr. David Knapp. Knapp concluded that Blount's medical records and examination did not "support measurable medical, rheumatologic, neurologic, or orthopedic impairing conditions." (*Id.* at p. 2075.) He advised that any diagnosis of systemic lupus erythematosus was unsupported, and the evidence that Blount suffered from fibromyalgia was "less than impressive." (*Id.* at p. 2075.)

5

He also suggested that Blount's cognitive disturbances and fatigue might be attributable to the heavy narcotic therapy she was undergoing, as well as her reliance on anti-anxiety medications. (*Id.*) United of Omaha also obtained surveillance video of Blount engaging in limited physical activity, such as carrying items and pulling her hair into a ponytail. (*Id.* at pp. 1086-92.)

United of Omaha sent Blount a letter dated December 22, 2011, informing her that, based on the Knapp IME, the surveillance video, and a review of medical information from her treating physicians, Blount's claim for ongoing LTD benefits would be denied because she did not meet the definition of "disabled" applicable to claimants who had received benefits for over two years. (*Id.* at pp. 2014–15.) Blount appealed United of Omaha's denial, and on September 13, 2012, a third IME was performed by Dr. T. Scott Baker. Baker concluded that Blount was, in fact, incapacitated to the point that she could not maintain gainful employment. (*Id.* at p. 1120.) He attributed Blount's disability not to lupus or fibromyalgia, however, but to opioid hyperalgesia[1] and toxicity. The amount of oxymorphone and oxycodone Blount was taking daily was, Baker wrote, the equivalent of 1680 mg of morphine—whereas just 100 mg of morphine daily would be considered a high dose (*Id.* at p. 1116.) United of Omaha sent Blount a letter dated May 24, 2013, informing her that, while her denial of benefits had been overturned, the company now considered her benefits subject to its LTD policy's two-year substance abuse limitation. The letter accordingly informed Blount that United of Omaha would treat her benefits as payable only through May 23, 2015. (*Id.* at p. 1082.)

Blount continued to be treated with opiates under her physicians' supervision (*id.* at pp. 497–511, 896–99), and, in a letter dated September 8, 2014, United of Omaha reiterated its intent

---

[1] "Hyperalgesia" refers to increased sensitivity to pain. *See Kerr v. Comm'r of Soc. Sec.*, No. 12-CV-10119, 2013 WL 388987, at *3 (E.D. Mich. Jan. 10, 2013), *report and recommendation adopted sub nom. Kerr v. Commssioner of Soc. Sec.*, No. 12-CV-10119, 2013 WL 388176 (E.D. Mich. Jan. 31, 2013).

6

to refuse to pay benefits beyond May 23, 2015, based on her policy's substance abuse limitation (*id.* at pp. 453–55). In addition to its reliance on the substance abuse limitation, the September 8, 2014, letter also concluded that Blount would not be disabled from returning to her old job as a hospital controller. (*Id.* at p. 457.) Blount appealed, and, on June 17, 2015, Dr. Jacob Yacov Kogan completed a medical record review of her treatment history. (*Id.* at pp. 135–41.) Kogan identified "multiple factors that might contribute to the claimant's cognitive symptoms including opiate use, pain, fatigue, depression, and anxiety." (*Id.* at p. 140.) By letter dated June 18, 2015, United of Omaha informed Blount that it had upheld the denial of further benefits on appeal, focusing in particular on the conclusion that she would not be impaired from performing sedentary work after May 23, 2015. (*Id.* at p. 124.) Blount filed her Complaint challenging that determination in this court on August 12, 2015 (Docket No. 1), and United of Omaha filed an Answer (Docket No. 5). Both parties have now moved for judgment on the administrative record. (Docket Nos. 16 & 18.)

## LEGAL STANDARD

A denial of benefits challenged under ERISA is subject to *de novo* review unless the benefits plan gives the administrator discretionary authority in interpreting the plan and determining employee eligibility. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When a plan administrator has such discretionary authority, a court reviews a decision to deny benefits only for whether it was arbitrary and capricious. *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 983 (6th Cir. 1991) (citing *Firestone*, 489 U.S. at 115). "The arbitrary or capricious standard is the least demanding form of judicial review of administrative action." *Davis By & Through Farmers Bank & Capital Trust Co. of Frankfort, Ky. v. Ky. Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th

7

Cir. 1985)). Under this standard, the determination of an administrator will be upheld if it is "rational in light of the plan's provisions." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014) (quoting *Marks v. Newcourt Credit Grp., Inc.*, 342 F.3d 444, 457 (6th Cir. 2003)). Stated differently, a claim administrator's decision is not arbitrary and capricious if it "is based on a reasonable interpretation of the plan." *Shelby Cnty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 933–34 (6th Cir. 2000). The parties in this case agree that Blount's plan grants United of Omaha discretionary authority to determine eligibility and that the court's review, therefore, must be under the arbitrary and capricious standard.

While this review is "not without some teeth, it is not all teeth." *McClain*, 740 F.3d at 1064. "A decision reviewed according to the arbitrary and capricious standard must be upheld if it results from a deliberate principled reasoning process and is supported by substantial evidence." *Id.* (quoting *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010)) (internal quotation marks omitted). The court must review "the quantity and quality of the medical evidence and the opinions on both sides of the issue" to determine whether a reasoned explanation exists to support an administrator's decision. *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *McClain*, 740 F.3d at 1065 (citing *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003)). Moreover, a court must accept an administrator's rational decision, if it is not arbitrary or capricious, even in the face of an equally rational interpretation of a plan offered by a participant. *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005) (citing *Morgan v. SKF USA, Inc.*, 385 F.3d 989, 992 (6th Cir. 2004)).

8

When analyzing whether an administrator's decision was arbitrary and capricious, a court should consider a potential conflict of interest arising when a plan administrator both evaluates claims for benefits and pays benefit claims, as is the case here. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). Furthermore, such a conflict may exist to the extent that a company may be inclined to contract with an administrator more likely to deny claims. *Id.* at 114–15. In addition, "a plan administrator, in choosing the independent experts who are paid to assess a claim, is operating under a conflict of interest that provides it with a clear incentive to contract with individuals who are inclined to find in its favor that [a claimant] was not entitled to continued [disability] benefits." *Kalish v. Liberty Mut./Liberty Life Assur. Co.*, 419 F.3d 501, 508 (6th Cir. 2005) (quoting *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005)). Any potential conflict of interest does not change the standard of review, but it is a factor to consider in determining whether an administrator's decision was arbitrary and capricious. *Glenn*, 554 U.S. at 115–16.

## ANALYSIS

### I. Lack of Intervening Circumstances Following Blount's Initial Award of Benefits

Blount argues that United of Omaha's termination of her benefits was not supported by substantial evidence, because her condition was largely unchanged after having adequately demonstrated she was disabled and having been awarded benefits. United of Omaha responds that its denial was based on the opinion of several physicians whose review revealed, over time, that Blount was not disabled by lupus or fibromyalgia and that the allegedly disabling symptoms were the result of her ongoing use of opioids.

The administrative record includes substantial evidence supporting United of Omaha's interpretation of events. Several physicians have cast doubt on Blount's lupus diagnosis and

9

have noted the potential link between aggressive opioid use and the cognitive symptoms of which Blount has complained. "Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious . . . ." *McDonald*, 347 F.3d at 169. United of Omaha did not act arbitrarily or capriciously in ultimately agreeing with the Baker IME that Blount's disability was opioid-related, rather than crediting Wickersham's opinion that Blount suffered from lupus, particularly in light of the numerous other opinions undermining the lupus diagnosis.

United of Omaha also did not act arbitrarily and capriciously by choosing to reevaluate the extent of Blount's disability in light of the mounting evidence that her continuing symptoms had become inextricably bound up with her therapy, alongside the mounting evidence calling her initial diagnosis into question. Blount's attempt to characterize her condition as essentially unchanged over time ignores the escalation in her narcotic therapy and the fact that many of her cognitive symptoms unavoidably had to be considered in light of her substantial use of opioid narcotics. Moreover, it ignores the degree to which many of Blount's own treating physicians struggled to conclusively determine what was causing, and how to treat, her various complaints. Blount's is a case where pain, cognitive dysfunction, psychological stressors, and the side effects of medical pain management formed a web that was difficult, not only for United of Omaha, but also her own physicians, to untangle.

That is not to say that a plan administrator will always be justified in ordering IME after IME purely for the purpose of undermining an initial diagnosis. Here, however, United of Omaha's process was justified by the elusive nature of Blount's diagnosis, the progressive escalation of her medical pain management, the change in the definition of disability under the

10

Case 3:15-cv-00876   Document 22   Filed 08/08/16   Page 10 of 16 PageID #: 2985

plan after two years, and Blount's own appeals of her denials. Blount, therefore, cannot negate the substantial evidence supporting United of Omaha's conclusion simply by pointing to the fact that it postdates her initial diagnosis.

## II. Definition of "Substance Abuse"

Blount also argues that United of Omaha improperly applied its substance abuse bar to her benefits, because her use of narcotic pain medications was always done under appropriate physician supervision and related to an underlying diagnosis. *See Horn v. Life Ins. Co. of N. Am.*, No. 5:14-CV-3699, 2015 WL 4477039, at *8 (E.D. Pa. July 22, 2015) (holding that substance abuse bar did not apply because plaintiff's addiction "stemmed from a physical condition . . . that had already rendered her disabled"). United of Omaha counters that nothing in its plan precludes applying the bar to a disability caused by substance abuse merely because the substances being abused were being taken as prescribed by a treating physician.

As an initial matter, the court notes that, on Blount's appeal, United of Omaha upheld the termination of LTC benefits in this case based not on the substance abuse bar, but on the conclusion that Blount could return to work as a controller or, presumably, to comparable sedentary work. Blount can hardly be blamed, however, from continuing to question the role the bar played in her loss of benefits. Blount was informed on May 24, 2013, and again on September 8, 2013, that her benefits would end on May 23, 2015, pursuant to the substance abuse bar. Then, on her appeal, United of Omaha concluded that Blount's disability had entitled her to receive benefits right up to that exact date: May 23, 2015. (Docket No. 13, p. 127.) Blount's argument that the court should consider the applicability of the bar is therefore well taken. In any event, United of Omaha also relies significantly on the bar in its own Motion for Judgment on the Administrative Record.

11

As discussed above, United of Omaha's denial of benefits cannot survive arbitrary and capricious review unless it reflects "the result of a deliberate[,] principled reasoning process." *McClain*, 740 F.3d at 1064. "[A]n administrator's decision may be upheld . . . only based upon the administrator's stated rationale in the administrative record, without resort to *post hoc* rationalizations." *Cooper v. Unum Life Ins. Co. of Am.*, No. 1:09-CV-241, 2010 WL 5859544, at *7 (E.D. Tenn. Nov. 16, 2010) (citing *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 849 (6th Cir. 2000)), *report and recommendation adopted*, No. 1:09-CV-241, 2011 WL 703935 (E.D. Tenn. Feb. 17, 2011). Accordingly, the court must look to United of Omaha's own language and analysis in considering whether its interpretation and application of the substance abuse bar survives review.

At least at first, United of Omaha did a less than convincing job of explaining the relationship between Blount's diagnosis and the application of the substance abuse provision. In the letter of May 24, 2013, a representative of United of Omaha wrote:

> Dr. Baker noted he believed you are incapacitated and unable to maintain any gainful employment primarily due to your treatment medications. As such, the denial of your Long Term Disability claim was overturned and approved with a primary diagnosis of opioid hyperalgesia. This diagnosis would fall under the "Alcohol and Drug Abuse and/or Substance Abuse Limitation" provision of your policy.

(Docket No. 13, p. 1083.) United of Omaha's claim that Blount's primary diagnosis of opioid hyperalgesia "would fall under" the substance abuse bar appears to treat Blount's opioid hyperalgesia as necessarily synonymous with a conclusion that she was engaged in substance abuse. A review of relevant diagnostic sources, however, suggests that the mere presence of opioid-related symptoms is insufficient to categorically establish abuse.[2] The Diagnostic and

---

[2] While review on an ERISA administrative record typically precludes consideration of outside materials, courts may consult relevant reference sources that are necessary to interpret the record.

12

Statistical Manual of Mental Disorders, Fifth Edition ("DSM-V"), for example, defines "opioid use disorder"[3] to refer to a "problematic pattern of opioid use leading to clinically significant impairment or distress," as manifested by at least two items from an eleven-symptom list. Some of those symptoms may be negated, for diagnostic purposes, if the patient is taking the opioids under appropriate medical supervision, but most cannot. DSM-V at 541–42. While it may have been that Blount would have met this definition on May 24, 2013, such a conclusion would require more elaboration than simply noting that she suffered from opioid hyperalgesia. The International Classification of Diseases ("ICD-10"), which Blount's plan specifically references, provides similarly little support. The only ICD-10 diagnosis that United of Omaha has cited in this court to support its denial is "acute opioid intoxication." (Docket Nos. 17, p. 18; 21, p. 7.) United of Omaha's letter, though, does not resolve whether Blount's hyperalgesia is the result of acute intoxication or chronic use.

United of Omaha's letter of September 8, 2014, on the other hand, provides a significantly less cursory explanation of its denial of benefits, noting not only that Blount was suffering from symptoms related to her use of opioids, but that her medical record lacked "supporting evidence of a significant musculoskeletal destructive process warranting the escalating prescribing or ongoing opioid use." (Docket No. 13, p. 456–57.) The letter also affirmatively ties her symptoms to an "ongoing diagnosis of opioid dependence." (*Id.* at p. 457.) These conclusions – not only that Blount was experiencing a side effect of opioids, but that her

---

*See, e.g.*, *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 616 n.1 (6th Cir. 2006) (consulting a medical dictionary to interpret a note in the claimant's record).

[3] Prior to the adoption of the DSM-V in 2013, the Diagnostic and Statistical Manual of Mental Disorders drew a distinction between "substance abuse disorders" and "substance dependence disorders." The DSM-V "eliminated that distinction and now provides a single diagnostic category for substance use disorders." *Martin v. McDonald*, No. 14-3187, 2015 WL 5472810, at *4 n.6 (Vet. App. Sept. 18, 2015).

narcotic therapy was not justified and had resulted in ongoing dependence – provided a significantly firmer basis for applying the substance abuse bar.

Blount urges the court to adopt the reasoning of another case involving a substance abuse bar to disability benefits, *Dubois v. Paul Revere Life Insurance Company*, No. 04-C-2028, 2004 WL 2554449 (N.D. Ill. Nov. 9, 2004). In *Dubois*, the claimant underwent a number of spinal surgeries and eventually became addicted to the narcotic medications that were being used to treat his associated back pain. *Id.* at *1. His plan administrator eventually terminated his benefits pursuant to a 24-month limitation on benefits for "any disability which is caused by a psychiatric disorder, alcoholism, drug abuse or the use of any drug other than one administered on a doctor's advice." *Id.* at *2. The U.S. District Court for the Northern District of Illinois concluded that the administrator's decision was arbitrary and capricious, because the administrator "fail[ed] to address whether addiction to prescribed narcotics should be considered drug abuse" as defined by the plan. *Id.* at *5. The court did not endorse the proposition that use of prescribed drugs categorically could not be abuse. Rather, it concluded only that the plan administrator's failure to at least consider the possibility amounted to a failure to "provide 'a statement of reasons that allows a clear and precise understanding of the grounds for the administrator's position sufficient to permit effective review,'" as required by the Seventh Circuit. *Id.* at 6 (quoting *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775 (7th Cir. 2003)).

Insofar as *Dubois* requires a plan administrator to include specific language rejecting the argument that the use of prescribed medications as directed cannot be abuse, it is difficult to reconcile the case with the "extremely deferential" standard of review in cases where the court is asked only to decide if a plan administrator's decision was arbitrary and capricious. *McClain*,

14

740 F.3d at 1064 (quoting *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1107–08 (7th Cir. 1998)). "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Id.* at 1066 (quoting *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002). A decision is not arbitrary and capricious "[w]hen it is possible to offer a reasoned explanation, based on the evidence," for the outcome reached. *Id.* at 1065 (quoting *Shields*, 331 F.3d at 541). Overturning a plan administrator's decision based solely on its failure to include magic words rejecting a particular argument would, generally speaking, be inconsistent with the holistic and deferential nature of arbitrary and capricious review. Moreover, given that United of Omaha administered Blount's benefits for several years and based its conclusion on numerous records that discussed the context in which she had begun narcotic therapy, it would defy credulity to suggest that the company did not consider the fact that Blount's medicines had been taken as prescribed. Blount, therefore, can only prevail if she can show that it was categorically arbitrary and capricious for United of Omaha to apply the term "substance abuse" to a situation where the claimant's narcotic use was supervised by a doctor, regardless of whether the doctor's choice of treatments was actually appropriate. Even *Dubois* does not endorse such a blanket conclusion.

*Dubois*, moreover, did not involve a situation where the correctness of the claimant's initial diagnosis was brought into question. United of Omaha's decision was not based solely on the fact that Blount was experiencing symptoms related to her prescribed medications, but also its conclusion – based on substantial evidence – that a diagnosis of disabling lupus was unsupported. It is inconsistent with the discretion afforded United of Omaha under the plan to suggest that it can reject Wickersham's diagnosis but must accept his conclusion that Blount

15

required ongoing, debilitating doses of narcotics.

Blount is correct that a plan administrator seeking to invoke a bar such as the one relied upon here and in *Dubois* must do more than simply note that a claimant's symptoms are opioid-related. It must reach a reasoned conclusion, supported by substantial evidence, that the specific pattern of disabling narcotic use meets the definition of abuse under the plan. Here, however, United of Omaha has cleared that hurdle, and its decision therefore was not arbitrary and capricious.

## **CONCLUSION**

For the foregoing reasons, United of Omaha's Motion for Judgment on the Administrative Record will be granted, and Blount's Motion for Judgment on the Administrative Record will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

16

Case 3:15-cv-00876   Document 22   Filed 08/08/16   Page 16 of 16 PageID #: 2991